# 25-12624-DD

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

BEAVERDAM CREEK HOLDINGS, LLC, BEAVERDAM CREEK
INVESTORS, LLC, TAX MATTERS PARTNER,

Petitioner-Appellant

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee

## ON APPEAL FROM THE DECISION OF THE UNITED STATES
## TAX COURT

## ANSWERING BRIEF FOR THE APPELLEE

BRETT A. SHUMATE
  *Assistant Attorney General*
JOSHUA WU
  *Deputy Assistant Attorney General*

JENNIFER M. RUBIN          (202) 307-0524
ROBERT J. WILLE           (202) 514-5573
  *Attorneys, Tax Litigation Branch*
  *Civil Division, U.S. Department of Justice*
  *Post Office Box 502, Washington, D.C. 20044*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 11th Cir. R. 28-1(b) and Fed. R. App. P. 34(a), counsel for the Commissioner respectfully inform this Court that they believe that oral argument would assist the Court in understanding this complex case.

# TABLE OF CONTENTS

**Page**

Statement regarding oral argument.............................................................i

Table of contents....................................................................................ii

Table of citations ..................................................................................vi

Glossary ...............................................................................................xiv

Statement of jurisdiction......................................................................xv

     1.   Jurisdiction in the Tax Court......................................... xv

     2.   Jurisdiction in the Court of Appeals............................ xv

Statement of the issue............................................................................1

Statement of the case ............................................................................1

    (i)   Course of proceedings and disposition in the court
        below ...............................................................................1

    (ii)   Statement of the facts.....................................................1

     1.   The Georgia granite industry.................................1

     2.   The Easement Property and its history ...............2

     3.   The negotiation and sale of the Easement
         Property...................................................................4

     4.   Promotion of Beaverdam Creek Investors,
         LLC.........................................................................6

**Page**

5.     Easement contribution ..........................................8

6.     Granite City Quarries sale ...................................9

7.     Administrative proceedings ................................9

8.     Tax Court Proceedings ......................................10

    a.     Commissioner's experts.............................10

    b.     BC Investors' experts .................................13

    c.     The Tax Court's opinion ............................15

(iii)   Statement of the standard or scope of review ............22

Summary of argument ..........................................................23

Argument ...............................................................................25

    The Tax Court correctly found that the conservation easement donated by Beaverdam had a fair market value of $193,250, not $21,972,000 ......................................25

A.    The legal framework of easement deductions .............25

1.     The tax deduction for charitable donation of a conservation easement .................................25

2.     The valuation of conservation easements ..........27

**Page**

3. The comparable sales method of determining fair market value ...................................29

4. Application of general principles to mineral extraction as the proposed use...........................31

B. The Tax Court did not clearly err in finding the easement to be worth $193,250 ...................................35

1. The Tax Court properly used the comparable sales method and rejected the income method ...................................35

2. The Tax Court used a genuine comparable and confirmed its reasonableness with the prior sale of the Easement Property and other sales in the record ...................................41

3. The Tax Court's valuation follows the evidence and is reasonable, while BC Investors' valuation is "absurd"...........................47

C. BC Investors' arguments to the contrary lack merit ...................................49

1. The Tax Court reasonably did not rely on
BC Investors' experts' DCF analysis .................49

    a. Legal problems ...........................................50

    b. High-level factual problems .......................51

    c. The Tax Court identified numerous
    other problems with Dye's analysis ...........54

2. The Tax Court properly applied the fair
market value standard .......................................56

3. BC Investors' additional arguments lack
merit ...................................................................58

4. The Tax Court properly did not shift the
burden of proof, and it is not relevant in
any event .............................................................61

D. The Tax Court's penalty determination follows
from its merits ruling .................................................62

Conclusion ................................................................................63

Certificate of compliance ........................................................64

# TABLE OF CITATIONS

**Cases:**                                            **Page(s)**

*Anderson v. City of Bessemer City*,

    470 U.S. 564 (1985) ............................................................. 22

*Anderson v. Commissioner*,

    250 F.2d 242 (5th Cir. 1957) .................................... 29, 31, 46

*Bausch & Lomb Inc. v. Commissioner*,

    933 F.2d 1084 (2d Cir. 1991) ................................................ 29

*Blodgett v. Commissioner*,

    394 F.3d 1030 (8th Cir. 2005) ......................................... 61-62

*Boltar, L.L.C. v. Commissioner*,

    136 T.C. 326 (2011) ....................................................... 17, 38

*Bonner v. City of Prichard*,

    661 F.2d 1206 (11th Cir. 1981) (en banc)............................ 18

*Brooks v. Commissioner*,

    109 F.4th 205 (4th Cir. 2024) .............................................. 48

* Cases or authorities chiefly relied upon have asterisks.

**Cases (cont'd):** **Page(s)**

*Buckelew Farm, LLC v. Commissioner,*

No. 24-13268, 2025 WL 2502669

(11th Cir. Sept. 2, 2025) ............................................ 22, 26, 30

*Champions Retreat Golf Founders, LLC v. Commissioner,*

T.C. Memo. 2022-106 ............................................. 30

*Chandler v. Commissioner,*

142 T.C. 279 (2014) ............................................. 58

*Esgar Corp. v. Commissioner,*

744 F.3d 648 (10th Cir. 2014) ................................ 27

*Excelsior Aggregates, LLC, v. Commissioner,*

T.C. Memo. 2024-60 ............................................. 54

*\*Georgia Kaolin Co. v. United States,*

214 F.2d 284 (5th Cir. 1954) ................................ 32-34, 36-37

*Griffin v. Commissioner,*

315 F.3d 1017 (8th Cir. 2003) ................................ 62

*Helvering v. Nat'l Grocery Co.,*

304 U.S. 282 (1938) ............................................. 29

\* Cases or authorities chiefly relied upon have asterisks.

**Cases (cont'd):** **Page(s)**

*Jelke, Estate of, v. Commissioner,*

    507 F.3d 1317 (11th Cir. 2007) .............................................. 22

\*JL Minerals, LLC v. Commissioner,*

    T.C. Memo. 2024-93, *appeal pnd'g,*

    No. 25-11085 (11th Cir.) ........................... 32-34, 37, 46, 48, 50

*Kimball Laundry Co. v. United States,*

    338 U.S. 1 (1949) .................................................................... 30

*Olson v. United States,*

    292 U.S. 246 (1934) ................................................... 28-29, 38

*Palmer Ranch Holdings Ltd v. Commissioner,*

    812 F.3d 982 (11th Cir. 2016) ................................... 22, 29, 31

*Pine Mountain Pres., LLLP v. Commissioner,*

    978 F.3d 1200 (11th Cir. 2020) .............................................. 28

*Polack v. Commissioner,*

    366 F.3d 608 (8th Cir. 2004) ................................................. 62

\* Cases or authorities chiefly relied upon have asterisks.

**Cases (cont'd):** Page(s)

*Ranch Springs, LLC v. Commissioner*,

164 T.C. 93 (2025), *appeal pnd'g*,

No. 25-12753 (11th Cir.) ............... 30, 35, 37-38, 50-51, 59-60

*Savannah Shoals, LLC v. Commissioner*,

T.C. Memo. 2024-35, *appeal pnd'g*,

No. 24-12661 (11th Cir.) ..................................... 33, 40, 46, 57

*Seabrook Prop., LLC v. Commissioner*,

T.C. Memo. 2025-6, *appeal pnd'g*,

No. 25-12126 (11th Cir.) ................................................. 34, 46

*Stanley Works & Subsidiaries v. Commissioner*,

87 T.C. 389 (1986) ..................................................... 32, 38-39

*TOT Prop. Holdings, LLC v. Commissioner*,

1 F.4th 1354 (11th Cir. 2021) ............................. 22, 30, 42, 56

*United States v. 0.161 Acres of Land*,

837 F.2d 1036 (11th Cir. 1988) .............................................. 59

*United States v. 1.72 Acres of Land*,

821 F.3d 742 (6th Cir. 2016) .................................................. 30

* Cases or authorities chiefly relied upon have asterisks.

**Cases (cont'd):**                                                    **Page(s)**

*United States v. 320.0 Acres of Land,*

   605 F.2d 762 (5th Cir. 1979) ......................... 18, 26, 30, 32, 59

*United States v. 494.10 Acres of Land,*

   592 F.2d 1130 (10th Cir. 1979) ...................................... 30, 33

*United States v. 69.1 Acres of Land,*

   942 F.2d 290 (4th Cir. 1991) ..................................... 34, 48, 50

*United States v. 8.41 Acres of Land,*

   680 F.2d 388 (5th Cir. 1982) ................................... 26, 28, 30

*United States v. 91.90 Acres of Land,*

   586 F.2d 79 (8th Cir. 1978) ........................................ 27-28, 60

*United States v. Easements & Rights-of-Way Over a*

   *Total of 15.66 Acres of Land,*

   779 F. App'x 578 (11th Cir. 2019) .......................................... 35

*United States v. Sowards,*

   370 F.2d 87 (10th Cir. 1966) ...................................... 30, 50-51

*United States v. Whitehurst,*

   337 F.2d 765 (4th Cir. 1964) .......................................... 30, 32

\* Cases or authorities chiefly relied upon have asterisks.

**Cases (cont'd):** **Page(s)**

*Van Zelst v. Commissioner*,

100 F.3d 1259 (7th Cir. 1996) ........................ 31, 42, 48, 51, 58

*Whitehouse Hotel Ltd. P'ship v. Commissioner*,

139 T.C. 304 (2012), *aff'd in part, vacated in part,*

*remanded*, 755 F.3d 236 (5th Cir. 2014) ................................ 54

*Whitehouse Hotel Ltd. P'ship v. Commissioner*,

615 F.3d 321 (5th Cir. 2010) ................................................. 29

*Whitney Benefits, Inc. v. United States*,

18 Cl. Ct. 394 (1989), *aff'd,*

926 F.2d 1169 (Fed. Cir. 1991) ................................... 51, 60-61

*Wolfsen Land & Cattle Co. v. Commissioner*,

72 T.C. 1 (1979) ............................................................ 31, 59

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 170(a)(1) .................................................................. 25

§ 170(f)(3)(A) ............................................................... 25

§ 170(f)(3)(B)(iii) .......................................................... 25

§ 170(h) ...................................................................... 25

\* Cases or authorities chiefly relied upon have asterisks.

**Statutes (cont'd):**                                    **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 170(h)(7)................................................. 26

§ 6662(e)..................................................... 1

§ 6662(h)(2)(A)(i) ......................................... 62

§ 6664(c)(3) ................................................. 62

§ 7491......................................................... 16

SECURE 2.0 Act of 2022, Pub. L. No. 117-328,

136 Stat. 4459............................................. 26

**Regulations:**

Treasury Regulations (26 C.F.R.):

§ 1.170A-1(c)(1)................................... 27, 59

§ 1.170A-1(c)(2)............................... 27, 57, 59

§ 1.170A-14(h)(3)(i)............................... 27-28

43 C.F.R.:

§ 3830.12(b) ................................................. 32

\* Cases or authorities chiefly relied upon have asterisks.

**Miscellaneous:**                                            **Page(s)**

Philip N. Jones, *The Eighth Circuit Weighs In on the Burden of Proof-Will It Change the Outcome After All?*, 98 J. Tax'n 226 (2003) .........................................61

Robert H. Paschall, *Appraisal of Construction Rocks* (2d ed. 1999) ...........................................................................36

S. Rep. No. 96-1007 (1980).............................................................25

\* Cases or authorities chiefly relied upon have asterisks.

# GLOSSARY

| Term | Definition |
| --- | --- |
| BC Investors | Beaverdam Creek Investors, LLC |
| Beaverdam | Beaverdam Creek Holdings, LLC |
| Br. | Appellant's opening brief |
| Commissioner | Commissioner of Internal Revenue |
| DCF | Discounted cashflow |
| Doc. | Documents, as numbered by the Clerk of the Tax Court |
| Easement Property | 85 acres of mostly vacant land in Oglethorpe County |
| FPAA | Final Partnership Administrative Adjustment |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| SFM | Strategic Fund Manager, LLC |
| SGC | Service Granite Co., Inc. |
| Stip. | First Joint Stipulation of Facts (Doc. 40.) |
| SSO | Strategic Seek One, LLC |
| Tr. | Transcript (Docs. 225-226, 231-235, 248) |
| Treas. Reg. | Treasury Regulation (26 C.F.R.) |

# STATEMENT OF JURISDICTION

## 1. Jurisdiction in the Tax Court

The Commissioner issued a Final Partnership Administrative

Adjustment (FPAA) to the partners of Beaverdam Creek Holdings, LLC

(Beaverdam), disallowing Beaverdam's claimed noncash charitable

contribution deduction and asserting penalties on March 31, 2011.

(Doc. 1, p. 18.)[1] Beaverdam's Tax Matters Partner, Beaverdam Creek

Investors, LLC (BC Investors), timely petitioned the Tax Court to

challenge the FPAA on June 24, 2021. (Doc. 1.) The Tax Court had

court jurisdiction under I.R.C. § 6226(a), (f) (2017); I.R.C. § 7442[2].

## 2. Jurisdiction in the Court of Appeals

On July 17, 2025, the Tax Court entered a final decision that

disposed of all of the parties' claims. (Doc. 286.) BC Investors filed a

---

[1] "Doc." references are to the documents contained in the record on appeal, as numbered by the clerk of the Tax Court. "Br." references are to the opening brief.

[2] The partnership procedures applicable to Beaverdam were replaced in 2017 for subsequent tax years. Because of that, we note that certain provisions of the Internal Revenue Code are those that were in place in 2017. All other citations to the Code are to the present version.

timely notice of appeal on July 31, 2025.  (Doc. 287.)  I.R.C. § 7483.

This Court has jurisdiction under I.R.C. § 7482(a)(1).

## STATEMENT OF THE ISSUE

Whether the Tax Court correctly found that the conservation easement donated by Beaverdam had a fair market value of $193,250, and not $21,972,000, as claimed by Beaverdam.

## STATEMENT OF THE CASE

### (i) Course of proceedings and disposition in the court below

BC Investors, as Tax Matters Partner of Beaverdam, petitioned the Tax Court to challenge the disallowance of a $21,972,000 deduction that Beaverdam had claimed in 2017 for its charitable donation of a conservation easement.  (Doc. 1.)  After a trial, the Tax Court (Judge Goeke) issued a memorandum opinion (Doc. 282, T.C. Memo 2025-53) and a decision (Doc. 286), allowing a deduction of $193,250 and holding that a 40% penalty for a gross valuation misstatement applied pursuant to I.R.C. § 6662(e) and (h).

### (ii) Statement of the facts

#### 1. The Georgia granite industry

Northeastern Georgia contains one of the largest deposits of granite in the country.  (Doc. 282, p. 2.)  Because of this, Georgia leads the country in production and use of granite dimension stone.  (*Id.*)

Granite is categorized by grade: die stock is the highest grade of granite, followed by quarry run, base/coping, and curbing grades. (*Id.*, p. 3.) Die stock, quarry run, and base/coping grades are used in numerous products (such as buildings, monuments, furniture, and countertops); curbing grade, which has greater imperfections, is primarily used for street paving. (*Id.*)

Quarrying is a very technical and difficult job that requires specific skill and knowledge. Generally, quarries in the Elberton area are run by families that are local and have been in the business a long time. The quarry business usually would pass down from one generation to the next. (Doc. 201, Ex. 534-P, p. 30; Doc. 226, Tr. 512:11-20; Doc. 231, Tr. 838:7-12; Doc. 234, Tr. 1354:14-25, 1355:1-7.) Finding a purchaser for a quarry in the Elberton Area can be difficult due to a lack of capital and because banks give loans based on the value of the property and not on the value of any potential underlying mineral rights. (Doc. 226, Tr. 489:18-22, 503:4-12.)

## 2. The Easement Property and its history

The easement property at issue (the "Easement Property") is 85 acres of mostly vacant land in Oglethorpe County, ten miles southwest

of Elberton. (Doc. 282, p. 3.) Service Granite Co., Inc. (SGC), owned by members of the Miller family, operated a granite quarry on the Easement Property, starting in the 1950s. (*Id.*) SGC first leased the Easement Property but eventually bought it in the 1980s. (*Id.*) SGC quarried Georgia Grey Granite from the Easement Property and sold it to various customers. (*Id.*)

SGC operated the quarry until 2006, when it was leased and operated by Lexington Blue Granite, Inc. (Lexington Blue.) (*Id.*, p. 4.) After borrowing $100,000 from Regions Bank, Lexington Blue fell into financial trouble and ceased operating the quarry on the Easement Property in August 2008. (*Id.*) North Ridge Quarries, Inc. (North Ridge), then leased the Easement Property from SGC and operated the quarry from August 2008 to February 2012. (*Id.*) North Ridge was operated by a veteran of the granite industry named David Giannoni. (*Id.*) It was initially successful, but later ran into issues due to bad decisions about what part of the quarry to extract granite from and the quality of its crew. (*Id.*) North Ridge's operation thus became unprofitable, and Giannoni ceased quarrying on the Easement Property and focused on a different quarry he owned. (*Id.*)

One of the owners of SGC, Carolyn Miller, personally guaranteed the loan to Lexington Blue but died before it was fully paid. The loan went into default, leading to a lien against assets of Carolyn Miller's estate, which included her interest in SGC. (*Id.*) Carolyn Miller's sister-in-law, Carmelita Miller (Lita Miller), served as the executrix of Carolyn Miller's estate. (*Id.*) In this role, she was often contacted by creditors about the outstanding Regions Bank loan debt. (*Id.*) She engaged an attorney, Judge J. Jenkins, to help her handle the potential disposition of the Easement Property. (*Id.*, p. 4.)

### 3. The negotiation and sale of the Easement Property

The Strategic Group was founded in 2007 and has invested in real estate across the country. (*Id.*, p. 5.) The Strategic Group partners James Freeman and Ricky Novak started working on conservation easement projects through the Strategic Group around 2011. (*Id.*, p 5.) In 2016 or 2017, the Strategic Group partnered with Lee Ellis and Manny Kaloyannides to form Strategic Seek One, LLC (SSO), also for the purpose of investing in real estate. (*Id.*, p. 5.) Freeman and Novak were managers of SSO and primarily ran the high-level business operations, while Ellis and Kaloyannides focused on "on the ground"

relationships and doing the initial work on potential real estate deals. (*Id.*, p. 5.) Ellis found potential properties for SSO to invest in and contact property owners. (*Id.*, p. 5.)

Ellis identified the Easement Property as a potential SSO investment and approached Lita Miller about potentially purchasing it from SGC. (*Id.*, p. 6.) The Easement Property was not listed for sale when Ellis reached out to Lita Miller unsolicited at her home in the spring of 2017. Prior to Ellis approaching her, Lita Miller did not attempt to sell the Easement Property or the quarry. (Doc. 201, Ex. 529-P, p. 2; Doc. 202, Ex. 557-P, p. 1, Doc. 248, Tr. 597:9-15.) Lita Miller knew other quarry operators but did not ask her attorney to solicit interest from other quarry operators to look at the Easement Property. (Doc. 248, Tr. 698:10-15, 694:1-8.) She also had no personal financial troubles. There was no debt on her personal residence. (Doc. 248, Tr. 693:24-25.) She never asked her attorney to assist her with filing for bankruptcy or communicated any intent to file for bankruptcy. (Doc. 248, Tr. 693:14-20, 693:24-694:6, 695:6-12.)

In April 2017, Ellis and Kaloyannides met with Lita Miller and the parties agreed to a tentative sale of the Easement Property. (Doc.

282, p. 6.)  Later that year, Beaverdam acquired the Easement Property from SGC in exchange for a 99% interest in Beaverdam, and then SGC transferred a 97% interest in Beaverdam to SSO in exchange for $228,000.  (*Id.*)  After adjusting for SSO's contribution of $10,000 in exchange for 1% of Beaverdam, this yields an effective sale price of $225,052, or $2,647 per acre (Doc. 282, p. 47 n.2.), and allowed Lita Miller to satisfy the loan to Regions Bank.  (*Id.*, p. 47.)

### 4. Promotion of Beaverdam Creek Investors, LLC

On August 23, 2017, BC Investors was formed with a principal place of business in Georgia.  (Doc. 282, p. 8.)  BC Investors was created to invest in and manage Beaverdam, ostensibly to pursue one of two strategies: (1) an investment strategy involving holding the Easement Property for future appreciation and/or quarrying or (2) a conservation strategy involving the contribution of a conservation easement regarding the Easement Property.  (*Id.*)

BC Investors issued a private placement memorandum dated December 7, 2017, offering 183 Class A Units at a price of $25,000 per unit for a total offering price of $4,575,000.  (Doc. 40, Ex. 19-J, p. 1.) The memorandum explained how the $4,575,000 proceeds would be

used. BC Investors would purchase SSO's interest in Beaverdam for $950,000 and SSO would realize an immediate $722,000 profit from reselling of its interest in Beaverdam. Another $1.1 million would be set aside to fund a private equity fund known as the Strategic Real Estate Opportunity Fund. (*Id.*, pp. 2, 9, 17, 22-23, 38.)

The prospectus for BC Investors described the individual tax deduction benefit through the case study of one hypothetical taxpayer who could invest $50,000, take a $275,000 tax deduction, and reduce their income tax liability from $215,000 to $125,885 in taxes in the first year alone if the conservation strategy were pursued. (Doc. 40, Ex. 21-J, p. 2.) One investor referred to the investment as a 4:1 deduction. (Doc. 206, Ex. 201-R, p. 2)

BC Investors sold all 183 units offered in its private placement memorandum. On December 27, 2017 (after SGC transferred a 97% interest in Beaverdam to SSO in exchange for $228,000), SSO transferred a 97% interest in Beaverdam to BC Investors for $950,000. (Doc. 282, p. 9.) The same day, Beaverdam amended and restated its initial Operating Agreement and admitted BC Investors as a member and the manager of Beaverdam (replacing SSO as manager). (*Id.*) In

December 2017, BC Investors contributed about $2.3 million to Beaverdam, and Beaverdam invested $1,100,436 in a real estate investment fund managed by Mr. Freeman, Mr. Novak, and Strategic Fund Manager, LLC (SFM). (*Id.*) Freeman and Novak were managers of SFM. During 2017, SFM also managed BC Investors. (*Id.*)

### 5. Easement contribution

Beaverdam never attempted to hire an operator or employees, buy equipment, or otherwise move toward restarting the quarry on the Easement Property. (Doc. 282, p. 10.) Instead, Beaverdam coordinated the contribution of the Easement Property with Foothills Land Conservancy starting in September 2017, in anticipation of completing a conservation donation before the end of 2017. (*Id.*)

By deed recorded December 28, 2017, Beaverdam conveyed an easement to Foothills Land Conservancy. (*Id.*) Among other things, the easement deed provided that the Easement Property would be preserved "as a viewshed and open space for the scenic enjoyment of the general public" in perpetuity. (*Id.*) The easement deed generally prohibited the construction of buildings and the use of the property for

commercial or industrial purposes, and explicitly prohibited "further mining of the Property." (*Id*.)

### 6. Granite City Quarries sale

SSO is a partner in Hearthstone Holdings, LLC (Hearthstone Holdings). (Doc. 232, Tr. 1065:14-16, 1096:14-16.) In 2018, Hearthstone Holdings purchased a 98% interest in an abandoned quarry property for $300,000 that began quarrying operations as Granite City Quarries in 2022. (Doc. 232, Tr. 1061:24-1062:2, 1065:21-25, 1095:2-3, 90.) Hearthstone Holdings' purchase of the abandoned quarry property in 2018 was structured similarly to the purchase by Beaverdam where the prior property owner retained a one or two percent interest in Hearthstone Holdings. In 2022, Hearthstone Holdings bought out the prior owner, entered into a joint venture with David Dye and his father Pete Dye, and commenced quarry operations as Granite City Quarries. (Doc. 232, Tr. 1061:24-25, 1062:1-2, 1064:20-25, 1065:1-4, 1065:7-16, 1066:23-1067:4.)

### 7. Administrative proceedings

Beaverdam filed a Form 1065, U.S. Partnership Income Tax Return, for the period beginning December 28, 2017, and ending

December 31, 2017. (Doc. 40, Stip. ¶ 3, Ex. 1-J.) On its Form 1065, Beaverdam claimed a noncash charitable contribution deduction of $21,972,000 for the donation of the conservation easement on the Easement Property. (Doc. 40, Stip. ¶ 41, Ex. 1-J, p. 12.) The Commissioner issued an FPAA to Beaverdam disallowing Beaverdam's claimed noncash charitable contribution deduction and asserting penalties. (Doc. 40, Stip. ¶ 4, Ex. 2-J.)

### 8.    Tax Court Proceedings

BC Investors, as Beaverdam's Tax Matters Partner, filed a petition with the Tax Court to challenge the FPAA. (Doc. 1.) After certain issues were resolved via stipulation and summary judgment (see Doc. 282, p. 16), the Tax Court conducted a trial on valuation of the Easement Property and whether Beaverdam attached a "qualified appraisal" to its return.

### a.    Commissioner's experts

Much of the testimony at trial was from expert witnesses. The Commissioner engaged Leslie Sellers to perform an appraisal of the conservation easement. (Doc. 203, Ex. 700-R.) Sellers has been an independent real estate valuation consulting expert since 1976, served

as the National President of the Appraisal Institute in 2010, is a current Member of the Appraisal Institute, and holds a Certified General Appraiser Certification in Georgia.  (Doc. 203, Ex. 700-R, pp. 5-6.)

Sellers performed a comparable sales analysis to determine the value of the Easement Property.  He identified seven arm's-length comparable sales.  To identify comparable properties, he looked at tax records, mapping of the mining sites, aerial photographs, and interviews about the potential comparable sales.  (Doc. 235, Tr. 1711:6-11.)  The characteristics he ultimately used for the seven comparable sales were property rights, market conditions, location, access/frontage, size, topography, access to utilities, and existence of a quarry.  (Doc. 203, Ex. 700-R, pp. 75-76.)  The prices per acre of the comparable sales are summarized in the table below, listed by size:

| Size (Acre) | Price Per Acre |
|---|---|
| 40.97 | **$2,800.00** |
| 73.21 | **$1,707.42** |
| 83.44 | **$2,996.27** |
| 111.38 | **$2,228.18** |
| 114.42 | **$2,350.00** |
| 130.22 | **$1,996.62** |
| 199.87 | **$2,501.59** |

(*Id.*, p. 75-76.) Sellers valued the Easement Property at $2,500 per acre, for a total before value of $215,000 (rounded). (*Id.*, p. 78.)

The Commissioner also called Raymond Krasinski, who works for the IRS as a lead appraiser, to review the appraisal attached to Beaverdam's return. (Doc. 235, Tr. 1581:1-3.) Krasinski is a licensed appraiser in Florida, a member of the Appraisal Institute, an MAI member, a designated member of the American Society of Appraisers, the ASA, and holds the AI-GRS, a general review specialist with the Appraisal Institute. (*Id.*, Tr. 1578:16-21.) As of 2023, Krasinski sits on the eight-member Standards Board, which authors USPAP. (*Id.*, Tr. 1580:1-24.)

As part of his analysis in reviewing the validity of the appraisal, Krasinski identified sales of twelve active quarries between 2002 and 2016 that ranged in value from $1,266 to $10,763 per acre, with a median of $2,453 per acre. (Doc. 239, Ex. 703-R, pp. 87-88.) Krasinski also found sales of six parcels with quarries with exposed granite, similar in size and near to the Easement Property, that sold in the range of $1,818 to $3,176 per acre between 2013 and 2016, after adjusting for market appreciation. Each of these six comparable sales

identified by Krasinski had at least one quarry pit on the property.

Below is a chart from Krasinski's report regarding the six comparable

sales:

| # | Location | Sale Date | Sale Price | Acres | Price Per Acre | Time Adj. | Adj. $/Ac |
|---|----------|-----------|------------|-------|----------------|-----------|-----------|
| 1 | 259 N. Eades Road | Dec-14 | $248,175 | 111.38 | $2,228 | 6% | $2,362 |
| 2 | xx N. Point Peter Rd. | Dec-13 | $260,000 | 130.22 | $1,997 | 9% | $2,176 |
| 3 | xx Lexington Carlton Rd. | Aug-15 | $35,000 | 19.2 | $1,823 | 3% | $1,878 |
| 4 | xx Ruffs Road | Dec-14 | $250,000 | 83.44 | $2,996 | 6% | $3,176 |
| 5 | xx Veribest Road | Jun-16 | $100,000 | 55 | $1,818 | 0% | $1,818 |
| 6 | 1765 Martin Villa Rd. | Dec-16 | $178,322 | 77.7 | $2,295 | 0% | $2,295 |

**Non-Active Dimension Stone Mine Site Sales**

**Analysis**

| | |
|---|---|
| Average | $2,284 |
| Median | $2,236 |
| High | $3,176 |
| Low | $1,818 |

(*Id.*, p. 83; *see also* Doc. 282, at p. 59.) Krasinski and Sellers

independently found three comparable sales in common, without having

read each other's reports. (*Compare* Doc. 203, Ex. 700, pp. 74-76 *with*

Doc. 239, Ex. 703-R, pp. 75-81, Doc. 235, Tr. 1630:1-7.) Each of these

three overlapping sales had granite dimension stone quarries that

either had closed or were in operation at the time of sale. (Doc. 203, Ex.

700, pp. 74-76; Doc. 239, Ex. 703, pp. 36-37, 44-45, 76-77, 79.)

### b. BC Investors' experts

BC Investors offered expert testimony from Dr. Criss Capps, a

geologist with a master's in geology, a Ph.D. in economic geology, and

experience in industrial minerals exploration and development. (Doc.

282, p. 16.) Dr. Capps conducted three discounted-cashflow (DCF) analyses and concluded that there was "a combined total of US$22.3M total resource valuation" on the Easement Property before conveyance of the easement. (*Id.*)

BC Investors also offered expert testimony from Tyler Peck, a mining engineer at Burgex Mining Consultants, Inc. (Burgex). Peck prepared a "Market Study and Project Evaluation" report regarding Beaverdam. Using a DCF analysis and a 20-year timeframe, Peck concluded that the net present value (NPV) of the Easement Property was $20,073,000. Peck also concluded that "[a] study considering the modifying factors necessary to convert the measured resource to a reserve is highly recommended. Additional drilling, engineering, testing, infrastructure planning, and market research are also recommended to further reduce risk." (*Id.*)

BC Investors also offered expert testimony from David Dye. (*Id.*, p. 17.) Dye has owned and operated multiple granite quarries in Elberton and is the current owner of Granite City Quarries. (Doc. 201, Ex. 534-P, pp. 2-5.) He provided testimony regarding valuation, granite quarrying, production, operation, and distribution. (Doc. 282, p. 17.)

He used a 25-year timeframe and three DCF analyses with different discount rates (7.5%, 9%, and 11%), concluding that "Beaverdam could have expected to have generated between $23 to $33.5 million in [NPV] by operating a granite quarry on the" Easement Property. (*Id*.)

### c.    The Tax Court's opinion

The Tax Court issued a memorandum opinion allowing Beaverdam's deduction at a greatly reduced amount and upholding the application of the 40% penalty for a gross valuation misstatement. (Doc. 282.)[3]

The court first addressed BC Investors' request that the court reconsider its previous order refusing to shift the burden of proof to the Commissioner. The court reaffirmed its determination that the burden of proof lies with BC Investors even if the FPAA was arbitrary and capricious because the burden remains on taxpayers to prove their entitlement to deductions. (Doc. 282, pp. 23-25.)

The court also rejected BC Investors' argument that the burden of proof regarding the valuation of the Easement Property should have

---

[3] The Commissioner has not appealed the Tax Court's holding that Beaverdam had attached a qualified appraisal to its return, and we do not further address it.

shifted under I.R.C. § 7491, which shifts the burden of proof when the taxpayer introduces credible evidence with respect to a factual issue. The court found that "neither Mr. Peck's nor Mr. Dye's conclusion credibly supports the $21,972,000 charitable contribution deduction claimed by Beaverdam." (*Id.*, p. 26.) Specifically, the court faulted Peck for his forecast that "(1) the price of granite would increase 2.5% per year, (2) Beaverdam would increase production of granite each year, and (3) Beaverdam's mining and processing costs per cubic foot of granite quarried would decrease every year of operations 'as economies of scale are achieved.'" (*Id.*, pp. 26-27.) This analysis, the court observed, assumed that "a productivity miracle would occur" without sufficient support or reasoning. (*Id.*, p. 27.)

The court also found Dye's analysis to be "lacking." (*Id.*, p. 28.) Specifically, the court noted that statements he made were "poorly explained and/or did not make sense, and his financial analysis was vague and not convincing." (*Id.*) Among the specifics the court pointed to were: (1) his failure to explain why it was feasible for Beaverdam to enter the quarry market when it was not feasible for small monument makers, (2) his unreasonably low initial capital investment amounts

required to restart the quarry, (3) his failure to project any period of startup work, (4) his poor explanation of projected costs, and (5) "sizable, unexplained discrepancies" between his analysis and the records he attached to support his figures.  (*Id.*, pp. 29-34.)  The court also found that both Peck and Dye erred by "valu[ing] Beaverdam as a hypothetical business, which BC Investors equated to the fair market value of the easement property before the conveyance of the easement." (*Id.*, p. 35.)  The court found "that speculative business valuations that made no attempt to reflect the fair market value of the easement property do not credibly support Beaverdam's claimed $21,972,000 charitable contribution deduction."  (*Id.*)

After determining that the highest-and-best use of the Easement Property was to operate a quarry,[4] the court turned to valuation.  The court first noted that "it does not flow from our highest and best use ruling that we should determine the before value of the easement property using the income method."  (*Id.*, p. 42 (citing *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011)).  On the contrary, "[c]ourts

---

[4] The Commissioner does not challenge on appeal the determination that the Easement Property's highest-and-best use was to operate a quarry.

have consistently recognized that, in general, comparable sales constitute the best evidence of market value." (*Id.*, p. 43-44 (quoting *United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979)[5]). The court further explained that it has "repeatedly affirmed that actual arm's-length sales [of a subject property] occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation methods." (*Id.* (citation omitted).)

The court explained that it did "not agree with either party" but rather based its value for the Easement Property on its "own examination of the record." (Doc. 282, pp. 44-45.) But the court's analysis aligned more closely with the Commissioner's than with BC Investors', as it found that "[w]hile we do not completely agree with [the Commissioner]'s position, it is not unreasonable." (*Id.*, p. 47.) BC Investors' position, on the other hand, was "absurd." (*Id.*)

The court explained at length the flaws with BC Investors' position. First, its experts were not credible. (*Id.*, p. 48.) Second, the

---

[5] This Court treats as precedent Fifth Circuit cases decided before September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

income method was neither mandated by the highest-and-best-use finding nor used properly by BC Investors. (*Id.*) Third, BC Investors "pointed to no property sales data that comes close to substantiating that $23 million was a reasonable fair market value for the easement property." (*Id.*, p. 49.) Fourth, BC Investors' use of the income method suffered from several methodological flaws. (*Id.*, pp. 52-56.) In summing up these points, the court observed that BC Investors' valuation is "completely untethered from reality," which is likely the reason that BC Investors "produced no sales data that remotely supports its DCF analyses." (*Id.*, p. 56.)

The court determined that the Easement Property's before-value was $300,000, relying on its own application of the comparable sales method and cross-checking its valuation with SGC's effective sale of the Easement Property for $225,052 in 2017. (*Id.*, p. 56-57.) It utilized the effective sale of Granite City Quarries in 2018 as the primary comparable. The court noted that Dye testified that the properties were broadly comparable and that he stated in his report "[t]he Granite City quarry shares many similarities with the type of quarry that Beaverdam contemplated opening." (*Id.*, p. 57.) The court found that

"[c]onsidering the similarities between Granite City Quarries and the easement property and the sale dates only a year apart, the Granite City Quarries sale price around $300,000 is strong evidence regarding the before value of the easement property." (*Id.*)

The court found that the data in Krasinski's and Sellers' reports also supported a fair market value of $300,000. (*Id.*, pp. 58-60.) The court found particularly notable the sales of the three properties that were found in both Krasinski's and Sellers' reports: (1) a 114-acre property sold for $268,887 in October 2016 ($2,350 per acre), (2) a 73-acre property sold for $125,000 in November 2013 ($1,707 per acre), and (3) a 200-acre property sold for $500,000 in February 2011 ($2,501 per acre). (*Id.,* pp. 59-60.) The court also observed that there were sales of quarry businesses in 2018-2020 for $1.5 to $2.5 million. (*Id.*, p. 60.)

The court also considered Lita Miller's sale of the Easement Property for about $225,000 and found it "to be representative of only a ballpark before value." (*Id.*, p. 62.) But the court noted that "BC Investors' position that SGC effectively sold the easement property for around 1% of its fair market value is incorrect." (*Id.*) And the court recognized that "Lita Miller and Judge J. Jenkins are not fools," but

rather that they understood that "[n]o reasonable person would have paid anything close to $20 million dollars" for the Easement Property in 2017. (*Id.*)

The court summarized its consideration of the evidence to reach its before-easement $300,000 valuation conclusion as follows:

> Considering all the evidence regarding valuation, we assign the most weight to (1) the sale of Granite City Quarries for about $300,000 during 2018; (2) SGC's effective sale of the easement property for $225,052 in 2017 and other facts regarding the sale; (3) other sales data (including whether the purchase was of land or a business); (4) testimony and evidence showing that there were reserves of quality granite on the easement property; (5) the fact that the easement property had been quarried for decades before 2012; and (6) the fact that the quarry on the easement property had been abandoned for five years before 2017.

(*Id.*, p. 62.) After subtracting out the agreed after-easement value of $106,750 from the court-determined value of $300,000, the Tax Court concluded that the easement's value was $193,250. (*Id.*, p. 63.) Because the easement valuation claimed on Beaverdam's return ($21,972,000) was more than 200% of the valuation that the court had found, it determined that a gross valuation misstatement penalty applied. (*Id.*, p. 63-64.) The court entered a decision consistent with its opinion (Doc. 286), and BC Investors appealed.

### (iii)  Statement of the standard or scope of review

This Court reviews the Tax Court's legal conclusions de novo and its factual findings for clear error.  *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1369-71 (11th Cir. 2021); *Palmer Ranch Holdings Ltd v. Commissioner*, 812 F.3d 982, 993-94 (11th Cir. 2016).  A determination of fair market value is a mixed question of law and fact: the appropriate valuation method is legal; the factual premises and inferences are factual.  *TOT*, 1 F.4th at 1369, 1371; *Palmer Ranch*, 812 F.3d at 993-94.  The mathematical computation of fair market value is factual.  *Estate of Jelke v. Commissioner*, 507 F.3d 1317, 1321 (11th Cir. 2007); *Buckelew Farm, LLC v. Commissioner*, No. 24-13268, 2025 WL 2502669, at *5 (11th Cir. Sept. 2, 2025).  There is no clear error when the trial court's findings are plausible considering the entire record or when it chooses among permissible views of the evidence.  *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985); *Buckelew Farm*, 2025 WL 2502669, at *5.  Statutory interpretation is a legal issue reviewed de novo.  *Estate of Jelke*, 507 F.3d at 1321.

## SUMMARY OF ARGUMENT

BC Investors asserted that the Easement Property had a value of $22,100,000 ($259,000 per acre) before a conservation easement was donated on it—far exceeding other comparable property sales and the amount that Beaverdam paid to obtain a 97% interest in the Easement Property just months before. The Tax Court reasonably rejected that inflated value, thereby reducing the resulting charitable deduction, and correctly determined that a gross valuation misstatement penalty likewise applies due to the grossly inflated easement valuation reported by BC Investors on Beaverdam's tax return.

Consistent with this Court's precedent, the Tax Court applied the before-and-after method to value the easement. In determining the before-value of the Easement Property, the Tax Court fully explained its reasoning, selected a comparable sale from the record evidence, and cross-checked it with other data. Its decision to do so is fully supported by the law, which permits the Tax Court to determine value based on the entire record. The comparable on which it relied is broadly similar to the Easement Property. Indeed, BC Investors' own experts testified to its similarity. The Tax Court's $300,000 ($3,550 per acre) valuation

is further supported by the previous sale of the Easement Property and other evidence of comparable sales in the record. In contrast, BC Investors' $22,100,000 before-value ($259,000 per acre) is not supported by valid comparables. It did, however, satisfy the deduction-to-investment ratio needed to generate the $89,115 in tax savings per $50,000 invested promised to investors.

BC Investors wrongly argues that the income approach with a DCF method must be utilized because the Tax Court found that a granite quarry is the Easement Property's highest-and-best use. But nothing mandates that the income approach be used to value mineral properties. BC Investors cites no cases in which the court determined that a property's highest-and-best use mandated the use of a specific valuation methodology. Indeed, although the income approach is useful for valuing a business with an operating history of generating net income, it is not favored for valuing vacant land with no available income-producing history.

Finally, BC Investors' attempts to revive their expert fall short. The Tax Court properly noted several flaws in their expert's methodology. BC Investors' arguments amount to little more than an

incorrect plea for this Court to substitute its own credibility judgment for that of the Tax Court.

## ARGUMENT

**The Tax Court correctly found that the conservation easement donated by Beaverdam had a fair market value of $193,250, not $21,972,000**

### A.  The legal framework of easement deductions

#### 1.  The tax deduction for charitable donation of a conservation easement

A taxpayer generally can claim a deduction for charitable contributions made during the taxable year, but a deduction is not allowed for gifts of partial interests in property.  I.R.C. § 170(a)(1), (f)(3)(A).  An exception exists for "a qualified conservation contribution." I.R.C. § 170(f)(3)(B)(iii).  Section 170(h) specifies the requirements for a qualified conservation contribution.

Congress intended this deduction to encourage conservation (see S. Rep. No. 96-1007 (1980), 1980 WL 12915, at *9), but it has been widely abused.  In August 2020, the Senate Finance Committee released a report finding that many syndicated conservation easement transactions "appear to be nothing more than retail tax shelters that let taxpayers buy tax deductions at the end of any given year, depending

on how much income those taxpayers would like to shelter from the IRS, with no economic risk." Staff of S. Comm. on Finance, Syndicated Conservation-Easement Transactions, S. Prt. 116-44, at 3 (Comm. Print 2020). Most taxpayers in such transactions saved two dollars in taxes for every dollar they paid to the promoters—enriching the promoters and costing the fisc an estimated $10.6 billion between 2010 and 2017. *Id.* at 2-3, 105. The report concluded that such transactions "risk not only depriving the government of billions of dollars of revenue but also degrading the general understanding that our Nation's tax laws apply equally to us all." *Id.* at 105. Accordingly, in December 2022, Congress enacted I.R.C. § 170(h)(7) to deny, prospectively, an easement deduction where "the amount of such contribution exceeds 2.5 times the sum of each partner's relevant basis in such partnership." SECURE 2.0 Act of 2022, Pub. L. No. 117-328, § 605, 136 Stat. 4459, 5275, 5393-96 (applicable to donations made after Dec. 29, 2022). Accurately valuing conservation easements allows the benefit Congress intended without enriching taxpayers and shelter promoters at the expense of the fisc. *See United States v. 320.0 Acres of Land*, 605 F.2d 762, 781 (5th Cir. 1979); *United States v. 8.41 Acres of Land*, 680 F.2d 388, 394 n.8 (5th

Cir. 1982); *United States v. 91.90 Acres of Land*, 586 F.2d 79, 89-90 (8th Cir. 1978).

## 2. The valuation of conservation easements

For property donations, the amount of the contribution "is the fair market value of the property at the time of the contribution." Treas. Reg. § 1.170A-1(c)(1). Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 1.170A-1(c)(2).

The value of a conservation easement donation likewise "is the fair market value of the perpetual conservation restriction at the time of the contribution."[6] Treas. Reg. § 1.170A-14(h)(3)(i). Because comparable easement sales are uncommon, an easement is typically valued by calculating "the difference between the fair market value of the property it encumbers before the granting of the restriction and the

---

[6] The principles and precedents governing the determination of fair market value are the same in conservation easement and eminent domain cases. *Esgar Corp. v. Commissioner*, 744 F.3d 648, 659 (10th Cir. 2014).

fair market value of the encumbered property after the granting of the restriction" (*id*.)—the approach used here (Doc. 282, pp. 62-63). *See Pine Mountain Pres., LLLP v. Commissioner*, 978 F.3d 1200, 1210-12 (11th Cir. 2020) (requiring before-and-after valuation if no comparable easement sales).

Under before-and-after valuation, the before-value must take into account a property's highest-and-best use, *viz.*, the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson v. United States*, 292 U.S. 246, 255 (1934). Highest-and-best use is not itself the measure of value but is considered "to the full extent that the prospect of demand for such use affects the market value." *Id.* at 255; *see 8.41 Acres*, 680 F.2d at 395 (property valued as whole, not as sum of uses); *91.90 Acres*, 586 F.2d at 87 (same). The touchstone for fair market value remains the probable result of fair negotiations between a willing seller and buyer, i.e., what the property would sell for in an open market. *Olson*, 292 U.S. at 257. The determination of fair market value "is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not

to require proof." *Id.*; *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957).

The Tax Court "has broad discretion to accept or reject all or part of an expert's opinion." *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 615 F.3d 321, 330 (5th Cir. 2010) (citing *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294-95 (1938)). For complex factual determinations, such as valuations, it is appropriate for an appellate court to give "[c]onsiderable deference to the Tax Court's evaluation of trial evidence, and especially expert testimony." *Bausch & Lomb Inc. v. Commissioner*, 933 F.2d 1084, 1092 (2d Cir. 1991) (valuing intangible property). A valuation with a basis in the record as a whole is not clearly erroneous, *Nat'l Grocery*, 304 U.S. at 294-95; *Anderson*, 250 F.2d at 249, and "[t]he tax court may determine its own valuation based on the whole of the evidentiary record." *Palmer Ranch*, 812 F.3d at 1002.

### 3. The comparable sales method of determining fair market value

As the Tax Court explained, common approaches to determining fair market value include (1) the market, or comparable sales, approach; (2) the income approach; and (3) the cost, or an asset-based, approach. (Doc. 282, p. 43.) "Courts have consistently recognized that,

in general, comparable sales constitute the best evidence of market value" for raw land. *320.0 Acres*, 605 F.2d at 798; *United States v. 1.72 Acres of Land*, 821 F.3d 742, 757 (6th Cir. 2016); *8.41 Acres*, 680 F.2d at 395; *United States v. Sowards*, 370 F.2d 87, 89 (10th Cir. 1966); *United States v. Whitehurst*, 337 F.2d 765, 775 (4th Cir. 1964). Haggling in an active market establishes the value at which property transfers. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5-6 (1949); *Sowards*, 370 F.2d at 89; *Ranch Springs, LLC v. Commissioner*, 164 T.C. 93, 143 (2025), *appeal pnd'g*, No. 25-12753 (11th Cir.). Even more, an arms-length sale, shortly before the valuation date, of the subject property or of control over the property's owner, provides "overwhelming" evidence of the value of the property. *TOT*, 1 F.4th at 1371; *Champions Retreat Golf Founders, LLC v. Commissioner*, T.C. Memo. 2022-106, at [*40].

The principle of substitution undergirds the comparable sales method. Fair market value cannot exceed what a buyer would pay for a similar property, because a rational buyer will not pay extra for a tract when it could buy similar land nearby at market price. *Ranch Springs*, 164 T.C. at 143-44; *see Buckelew Farm*, 2025 WL 2502669, at *7-8 (no clear error in application of substitution principle); *United States v.*

*494.10 Acres of Land*, 592 F.2d 1130, 1132-33 (10th Cir. 1979). Nor does the substitution principle change when the buyer intends to develop a business on the property. As the Seventh Circuit explained, when there are many potential sites available, the price of the land falls to the competitive level. *Van Zelst v. Commissioner*, 100 F.3d 1259, 1263 (7th Cir. 1996). If know-how, entrepreneurship, and financing are scarce but suitable land is not, the buyer-operator—not the selling landowner—will capture the returns on any development potential. *Id.*

The comparable sales method involves finding similar properties sold in fair market sales within a reasonable time of the valuation date. *Palmer Ranch*, 812 F.3d at 987; *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). Valuation is necessarily an approximation whose soundness depends upon the similarity of the comparables, the identification of the features and circumstances, and the reasonableness of the adjustments. *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957); *Wolfsen*, 72 T.C. at 19-20.

### 4. Application of general principles to mineral extraction as the proposed use

Land containing a mineral is not valued based on conjectural future demand for that mineral; minerals are relevant only to the

extent that their presence affects the property's market value. *Georgia Kaolin Co. v. United States*, 214 F.2d 284, 286 (5th Cir. 1954); *United States v. Whitehurst*, 337 F.2d 765, 771 (4th Cir. 1964). That is because the mere physical adaptability of a property to a use does not establish a market for that use, and speculative uses do not increase value as a matter of law. *320.0 Acres*, 605 F.2d at 814; *Whitehurst*, 337 F.2d at 772. Without proof of a market demand for a use, there is no legitimate reason to find that a property has additional value because of its suitability for that use. *320.0 Acres*, 605 F.2d at 814.

The principle of substitution is equally applicable to land containing minerals, and the fair market value of such a property cannot exceed what a buyer would pay for a similar property. *JL Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, at [*62], *appeal pnd'g*, No. 25-11085 (11th Cir.). Although the special suitability of a property for a use can enhance its value, uniqueness of the property is not determined solely by considering that property alone. *Stanley Works & Subsidiaries v. Commissioner*, 87 T.C. 389, 400 (1986); *JL Minerals*, T.C. Memo. 2024-93, at [*56], [*58], [*61]; *see* 43 C.F.R. § 3830.12(b) (uniqueness of mineral deposit determined by comparison).

If a mineral is plentiful throughout an area, a rational buyer will not pay a premium if similar tracts are available at a lower price. *494.10 Acres*, 592 F.2d at1132-33; *JL Minerals*, T.C. Memo. 2024-93, at [*62]. The market price of land will reflect all possible and permissible uses and components that contribute to its value. If a region is largely farmland over minerals, the market price is already the price of farmland over minerals, and a buyer will not pay extra when it could buy nearby farmland at market price. *Georgia Kaolin*, 214 F.2d at 285-86; *494.10 Acres*, 592 F.2d at 1132-33.

For that reason, the buyer-developer who extracts the mineral (not the landowner who happens to own land containing the mineral) will capture the returns to any development potential. In other words, "the discounted cashflow method is not valuing the property at all, but what a speculative business could do with the property. But a discounted cashflow method geared to what a business could earn is of limited utility in determining what a property is worth." *JL Minerals*, T.C. Memo. 2024-93 at [*63]; *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at [*45], *appeal pnd'g*, No. 24-12661 (11th Cir.) (ruling that even if the highest-and-best use of a property was as an

aggregate quarry, "the presence of known aggregate deposits has a minimal effect on the price of the land in the region").

When applied to vacant land with no available history of income production, the DCF method tends towards values of "chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong." *United States v. 69.1 Acres of Land*, 942 F.2d 290, 293-94 (4th Cir. 1991) (footnote omitted). "Where the income approach lacks good inputs, it becomes little more than fan fiction aimed at generating the highest numbers possible, no matter how objectively ludicrous." *JL Minerals*, T.C. Memo. 2024-93, at [*63] (*generally*, pp. [*62-65]); *Seabrook Prop., LLC v. Commissioner*, T.C. Memo. 2025-6 at [*57]-[*58], *appeal pnd'g*, No. 25-12126 (11th Cir.) (collecting cases). Indeed, using an income approach to value land is one way that promoters of conservation easements purport to find inflated value in properties that the mineral industry did not purchase for development. *See JL Minerals*, T.C. Memo. 2024-93, at [*47]. Instead, the market price of a property incorporates all its legal uses and components, including any mineral reserves. *Georgia Kaolin*, 214 F.2d at 285.

**B. The Tax Court did not clearly err in finding the easement to be worth $193,250**

The Tax Court used a comparable sale—cross-checked by the recent sale of the Easement Property, other sales data, and testimony in the record—to find a before-value of $300,000 as of the valuation date. (Doc. 282, p. 63.) In contrast, Beaverdam asserted a before-value, based on hypothetical future returns of more than $23,000,000, without any evidence that anyone has purchased land—including granite-bearing land—in this area for any comparable price. (Doc. 282, p. 49.) The court found an undisputed after-value of $106,750, yielding an easement value of $193,250. (*Id.*, p. 63.) Because the after-value is undisputed, we limit further discussion to the before-value.

**1. The Tax Court properly used the comparable sales method and rejected the income method**

The Tax Court correctly observed that "[i]n terms of proving market value, '[c]ourts have consistently recognized that, in general, comparable sales constitute the best evidence of market value.'" (Doc. 282, pp. 43-44 (quoting *United States v. Easements & Rights-of-Way Over a Total of 15.66 Acres of Land*, 779 F. App'x 578, 581–82 (11th Cir. 2019)); *see also Ranch Springs*, 164 T.C. 93, 147 (2025) ("If the deposit

to be appraised is undeveloped and non-producing, that is, is raw land, the sales comparison method is preferable." quoting Robert H. Paschall, *Appraisal of Construction Rocks* 3 (2d ed. 1999).) As a result, it utilized a comparable sales approach in valuing the Easement Property. (Doc. 282, p. 57.)

BC Investors wrongly argues that the income approach, using a DCF method, must be utilized because the Tax Court found that a granite quarry is the Easement Property's highest-and-best use. (Br. 27, 31-33.) But, as the Tax Court correctly noted, "nothing mandates that the income approach be used to value mineral properties such as the easement property." (Doc. 282, p. 48.) BC Investors cites no cases in which the court determined that a property's highest-and-best use mandated the use of a certain valuation methodology. Instead, the case law supports the Tax Court's methodology.

The Fifth Circuit, in a pre-1981 case, rejected the use of the income method even when the highest-and-best use was mining the property. *See Georgia Kaolin Co. v. United States*, 214 F.2d 284 (5th Cir. 1954). The question was the fair market value of land where the parties stipulated that the highest-and-best use was kaolin mining. *Id.*

at 285. The Fifth Circuit affirmed the district court's rejection of the landowner's proposed valuation method of "estimating the amount of stone in situ and multiplying this amount by a fixed price per unit." *Id.* at 286. The court explained that the landowner's proposed methodology involved numerous assumptions: "[W]hether or not the deposits would be mined and [what] royalties [would be] paid would depend upon the condition of the market, the uncertainty of the future, the demand for the product, 'and many other elements, on and on, in the future.'" *Id.* In other words, the Fifth Circuit upheld rejection of the income approach because it was too speculative. *Id.*

The Tax Court has also consistently rejected the use of the income method for valuing mineral property, even if mining were the property's highest-and-best use. *Ranch Springs*, 164 T.C. at 151; *see also JL Minerals*, T.C. Memo. 2024 93, at [*63]. In *Ranch Springs*, the court noted that "[t]he income method is most reliable when used to determine the value of an existing business, with a track record of growth, income, expenses, and profits." *Ranch Springs*, 164 T.C. at 151. This is because "[a] historical track record of this sort provides a plausible basis for projecting future revenue." *Id.* But "[t]he income

approach is rarely appropriate when seeking to determine the value of raw land or other undeveloped property with no existing cashflow." *Id.*

In addition, the Tax Court in this case correctly reasoned that "[t]he concept of 'highest and best use' is an element in the determination of fair market value, but it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value." *See Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011); *see also Stanley Works & Subsidiaries v. Commissioner,* 87 T.C. 389, 400 (1986); *Olson v. United States*, 292 U.S. 246, 255 (1934). In other words, the valuation methodology must consider the highest-and-best use, but the highest-and-best use cannot determine the methodology.

BC Investors claims that *Boltar*, *Stanley Works*, and *Olson* "do not support the notion that, once [highest-and-best use] is established, valuation can ignore [highest-and-best use] in favor of generic or distressed land sales." (Br. 31.) This wrongly implies that the Tax Court ignored the Easement Property's highest-and-best-use, and misconstrues the Tax Court's discussion of these cases. The Tax Court properly relied on these cases for the proposition that the determination

of a property's highest-and-best-use does not mandate the use of a DCF analysis of a proposed business on the property. For example, in *Stanley Works*, the court decided that it was reasonably probable the land would be used for the construction of a pumped storage plant (i.e., a pumped storage plant would be the property's highest-and-best use). *Stanley Works*, 87 T.C. at 413. In determining the value for the hypothetical pumped storage plant, however, the court used the average price-per-acre paid for land to be developed for a pumped storage plant as a guide to the property's value, rather than considering potential future revenue minus the costs of constructing a plant. *Id.*

In addition to correctly recognizing that its choice of valuation methodology is not determined by the highest-and-best use, the Tax Court also rejected the use of the income method for several case-specific reasons. Specifically: "(1) no quarry business existed and all parties were aware that there was never an intent for Beaverdam to operate a quarry; (2) Beaverdam lacked industry knowledge and was unable to operate a quarry business without a hypothetical business partner; (3) the experienced Giannoni had failed to successfully quarry the property, and it had been abandoned since 2012; (4) sufficient sales

data exists to establish a valuation that is based on actual transactions." (Doc. 282, p. 42-43; *see infra* pp. 57-58 (addressing objection to the Tax Court's consideration of Beaverdam's lack of industry knowledge).

Finally, testimony from BC Investors' own witness undermined the use of the income method. One of its experts, Peck, pointed out that the notion someone would pay an amount equal to the net present value of the granite in order to acquire the land makes no economic sense. (Doc. 231, Tr. 830:22-831:5.) Because a prospective buyer of a quarry property would generally be buying it for investment purposes, it would not make economic sense for a buyer to purchase the property for the same amount of money the property would generate over its projected lifetime—here, 25 years as forecast by BC Investors' expert. (*Id.*); *see Savannah Shoals*, T.C. Memo 2024-35, at [*45] ("We are not convinced that a quarry operator would pay the aggregate's net present value for the land as there would be no means for a profit.").

2. **The Tax Court used a genuine comparable and confirmed its reasonableness with the prior sale of the Easement Property and other sales in the record**

The Tax Court did not clearly err in finding that Granite City Quarries "is broadly comparable to the easement property in terms of quarry/granite features" and therefore anchoring its valuation analysis to this comparable. (Doc. 282, p. 57.) Dye testified as to the similarity of Granite City Quarries to the Easement Property. (Doc. 226, Tr. 255:19-23.) His report also noted that "[t]he Granite City quarry shares many similarities with the type of quarry that Beaverdam contemplated opening." (Doc. 201, Ex. 534-P, p. 55.) Hearthstone Holdings' purchase of the abandoned quarry property in 2018 was structured similarly to the purchase by Beaverdam where the prior property owner retained a one or two percent interest in Hearthstone Holdings. In 2022, Hearthstone Holdings bought out the prior owner, entered a joint venture with David Dye and his father Pete Dye, and commenced quarry operations as Granite City Quarries. (Doc. 232, Tr. 1061:24-25, 1062:1-2, 1064:20-25, 1065:1-4, 1065:7-16, 1066:23-1067:4.)

BC Investors criticizes the Tax Court's selection of the effective sale of Granite City Quarries for $300,000 as a comparable, but it says

very little about why it was improper for the Tax Court to select this sale. It claims several times in passing that the sale was "distressed" (Br. 2, 4, 6, 23, 33) or "made under duress" (Br. 36), but it offers no record evidence at any point in the brief to support these assertions. It briefly asserts (Br. 20) that the seller, Giannoni, ran into "financial problems" but its record citation (Doc. 282, p. 14) does not support this assertion, and it does not otherwise cite record evidence that the sale was compelled by Giannoni's financial circumstances. At a minimum, BC Investors has not shown that the Tax Court's selection of a comparable property was clearly erroneous. *See Van Zelst*, 100 F.3d at 1259 (selection of appropriate comparable parcels is "a question for the Tax Court"); *see also TOT*, 1 F.4th at 1371 ("[D]ifferent inferences from the underlying facts implicate matters of pure fact.").

The Tax Court bolstered its valuation analysis by cross-checking its $300,000 valuation with a recent sale of the Easement Property. As this Court has held, an arm's-length sale of a subject property shortly before the valuation date "provides overwhelming support for the Tax Court's finding of the before use value of the property." *TOT*, 1 F.4th at 1371. Shortly before the easement donation, SGC contributed the

Easement Property to Beaverdam and sold a 97% interest in Beaverdam to SSO for $228,000. (Doc. 282, p. 9.) These transactions (along with small cash payments) resulted in the sale of the Easement Property for an effective price of $225,052. (Doc. 282, p. 47 n.2.) That amount is consistent with the sale of Granite City Quarries that the Tax Court found to be comparable.

BC Investors claims that the Tax Court "discounted the 2017 Beaverdam Property contribution/sale as non-FMV because of distress and information gaps," (Br. 35)[7] but that is an overstatement of the Tax Court's finding. The Tax Court found that the sale provided a "ballpark figure" and used it to confirm the reasonableness of its approach. BC Investors offers little evidence that the sale was distressed other than the fact that Lita Miller was interested in paying off the debt on the Easement Property. (Br. 38-39.) But she had not previously listed the Easement Property for sale, and Beaverdam reached out to her about buying the property—not the other way around. *See supra* p. 5. And, contrary to BC Investors' claim that she was "under financial duress"

---

[7] BC Investors (Br. 35) cites pages 26 and 37 of the Tax Court's opinion (Doc. 282), but neither page even discusses the 2017 contribution/sale.

(Br. 38), there is no evidence suggesting that Lita Miller was in personal financial trouble and desperate to sell the Easement Property to meet personal financial obligations. *See supra* p. 5.

Even assuming SGC/Lita Miller's sale was distressed, there is nothing that prevents the Tax Court from utilizing that sale to confirm the reasonableness of the $300,000 comparable as part of its overall evaluation of the record. The difference between the Tax Court's valuation of $300,000 and Lita Miller's effective sale price of $225,000 implies a reasonable discount of 25% due to Lita Miller being motivated to pay off debt rather than to maximize the value of the Easement Property. By contrast, BC Investors' claimed valuation implies an absurd 99% discount. And as the Tax Court found: "Lita Miller and Judge J. Jenkins are not fools." (Doc. 282, p. 62.) The Tax Court did not commit any error, much less clear error, in rejecting the conclusion that Lita Miller, advised by a knowledgeable attorney, struck such a poor bargain.

The Tax Court also appropriately utilized sales data from the surrounding area to further cross-check its $3,550 per-acre valuation. The court noted that the range of per-acre values in sales that

Krasinski and Sellers found was consistent with $3,550 per-acre,
particularly focusing on the sales of three properties found in both
reports: (1) Briarpatch Quarry, a 114-acre property sold in October 2016
for $268,887 ($2,350 per acre), (2) a 73-acre property sold in November
2013 for $125,000 ($1,707 per acre), and (3) Echols Mill Quarry, a 200-
acre property sold in February 2011 for $500,000 ($2,501 per acre). (*Id.*,
pp. 59-60.) The court also observed that there were sales of active
quarry businesses for $1.5 million to $2.5 million in 2018-2020. (*Id.*, p.
60.) Notably, none of these sales approach the extraordinary
$22,100,000 valuation that BC Investors proposed for the Easement
Property.

BC Investors criticizes the Tax Court for relying on data in expert
witnesses' reports even though it did not adopt the experts' valuation
opinions and, in Krasinski's case, because his report was purportedly
rendered moot by the court's resolution of the qualified appraisal issue.
(Br. 34-36.) But the experts' reports were not excluded from evidence,
and there is nothing that prohibits the court as factfinder from partially
relying on an expert to confirm its analysis even if it doesn't adopt the
expert's conclusions. Expert testimony "may be given just such weight

as the Tax Court may consider it worth" considering all the evidence, and the court need not choose a valuation as to which there is specific testimony so long as its finding is within the range that may be properly deduced from the evidence. *Anderson*, 250 F.2d at 249.

For example, in *Savannah Shoals*, the Tax Court did not rely on an expert's comparable analysis to establish a before-value of the property, but it "discuss[ed] [the expert's] mining-use comparables analysis because it confirm[ed] that [the taxpayer] claimed an exorbitantly high, baseless value for the unencumbered easement property." *Savannah Shoals*, T.C. Memo, 2024-35, at [*47]. Likewise, in *Seabrook Prop., LLC v. Commissioner*, the Tax Court relied on a subset of the Commissioner's experts' comparables but used the taxpayer's expert's adjustment methodology to adjust their value. T.C Memo 2025-6, at [*51] ("[W]e reject [the taxpayer's expert's] comparable sales analysis except for parts of his adjustment methodology, which we apply to certain of [the Commissioner's expert's] comparables as we describe further below.").

In any event, there was other independent testimony in the record about some of the sales. Amanda Stepp, the manager of Blue Ribbon

Quarries whose family works in the quarry industry, testified regarding
the sale of Briarpatch Quarry, its approximate purchase price of
$250,000, and her family's operation of it. (Doc. 226, Tr. 393-396.) Dye
testified about his operation of the Echols Mill Quarry and his
subsequent purchase of it in 2011 for $500,000. (Doc. 225, Tr. 150-152,
222.). Again, these examples show the reasonableness of the Tax
Court's valuation and the absurdity of BC Investors' valuation.

### 3. The Tax Court's valuation follows the evidence and is reasonable, while BC Investors' valuation is "absurd"

The Tax Court's before-value for the Property is $300,000 ($3,550
per acre). (Doc. 282 p. 63.) That value is above the average per-acre
price for properties sold with abandoned quarries, and only slightly
below the per-acre price for properties sold with active quarries. (Doc.
282, p. 62-63.) In contrast, BC Investors asserted a before-value for the
property of $22,100,000 ($259,000 per acre)—an amount that is
unsupported by valid comparables but that satisfied the deduction-to-
investment ratio necessary to generate $89,115 in tax savings per
$50,000 invested promised to investors. (Doc. 282, p. 9.) The Tax Court
chose among permissible views of the evidence to find a value supported

by the record as a whole.  It did not err—let alone clearly err—in its
valuation.

The extraordinary divergence between BC Investors' valuation
and the actual prices paid for land in and around Oglethorpe County
and Elberton supports the Seventh Circuit's observation, "[o]nce again
actions speak more loudly than appraisals." *Van Zelst*, 100 F.3d at
1263.  It also shows the folly of extending the DCF method of valuing an
active business to the valuation of vacant land.   The Tax Court
correctly disregarded BC Investors' "fan fiction" valuation of "chimerical
magnitude" in favor of a valuation that matched the local market. *69.1
Acres*, 942 F.2d at 293; *JL Minerals*, T.C. Memo. 2024-93, at [*63].

Stated differently, BC Investors' valuation of the Easement
Property at $259,000 per acre defies common sense and flunks "any
reasonable smell test." *See Brooks v. Commissioner*, 109 F.4th 205, 222
(4th Cir. 2024) ("[R]emarkable was [the taxpayers'] attempt to claim a
$5.1 million deduction for a limited easement estate on property that
they had purchased in fee simple for $652,000 only a year earlier. Such
a claim simply does not pass any reasonable smell test, much less the
tax law's requirements.").  It defies common sense to think that Lita

Miller left *tens of millions of dollars on the table* when she sold the Easement Property just months before, simply because she wanted to pay off a relatively small debt on the Easement Property. It defies common sense to think that *every single quarry* around the Easement Property sold at a price per acre that was *one percent of purported market value* simply because "life happens" or the sellers were allegedly under "duress." (Br. 36, 39.) It defies common sense to think that sales of *active quarry businesses* would yield *one-tenth the purported value* (i.e. $1.5 to $2.5 million vs. $22 million) of the Easement Property, which lacks an active mining business and had been abandoned years earlier. (Doc. 282, pp. 60-61.) The Tax Court appropriately based its findings on common sense rather than BC Investors' fanciful musings.

## C. BC Investors' arguments to the contrary lack merit

### 1. The Tax Court reasonably did not rely on BC Investors' experts' DCF analysis

BC Investors defends the $22,100,000 value for the Easement Property using a DCF method. (Br. 44-53.) There are both legal and factual problems with BC Investors' arguments.

### a.    Legal problems

Given the availability of a good comparable and the recent sale of the Easement Property, it is questionable that a DCF analysis should be used at all to value the Easement Property.  DCF analyses seek to derive an asset's value from its expected future cashflows, because an investor will pay no more than the present value of the asset's anticipated net income.  *Ranch Springs*, 164 T.C. at 150.  As discussed earlier, it is useful for valuing a business with an operating history of generating net income (*id.* at 151), but it is not favored for valuing vacant land with no available income-producing history.  When applied to such land, DCF analysis tends to generate unrealistically high valuations because it assumes nothing ever goes wrong.  *See 69.1 Acres*, 942 F.2d at 293-94 (footnote omitted); *Sowards*, 370 F.2d at 90-91.  "Where the income approach lacks good inputs, it becomes little more than fan fiction aimed at generating the highest numbers possible, no matter how objectively ludicrous."  *JL Minerals, LLC*, T.C. Memo. 2024-93, at [*63]; *see generally*, *id.* at [*62]-[*65].

At issue is the fair market value of raw land.  As Peck noted, no rational developer would transfer all potential profits to a seller by

paying a prospective development's net present value for just the land. (Doc. 231, Tr. 830:22-831:5); *see Sowards*, 370 F.2d at 90-91; *Whitney Benefits, Inc. v. United States*, 18 Cl. Ct. 394, 409 (1989), *aff'd*, 926 F.2d 1169 (Fed. Cir. 1991); *Ranch Springs*, 164 T.C. at 95, 153-55.  Nor would a rational developer pay a calculated estimate if the market price for land is lower.  *Van Zelst*, 100 F.3d at 1263.  And banks in the area give loans based on the value of the property, not on the value of potential mineral rights.  *See supra* p. 2.

### b.    High-level factual problems

BC Investors did not present any evidence that a prospective buyer of the Easement Property would be willing to pay the net present value of the granite for the Easement Property.  No expert or fact witness said that they had paid or knew anyone that would pay the net present value amounts proffered by BC Investors for the Easement Property.

BC Investors quibbles with many of the specifics regarding the Tax Court's criticism of their experts (which we address below), but it fails to address many of the big picture problems identified by the Tax Court.  The Tax Court explained that the experts' use of the income

method was inappropriate because they "did not examine sales of similar properties as a check on the results they reached." (Doc. 282, p. 48.) The court cited USPAP Advisory Opinion AO-33, which explains that the DCF method is "vulnerable to misuse and misapplication" because "it is dependent on the analysis of uncertain future events." (Doc. 239, Ex. 703-R, p. 316.) The opinion further notes that DCF analyses are "often applied in developing value opinions in concert with one or more other approaches," and "[t]he results of [a] DCF analysis should be tested and checked for errors and reasonableness." (Doc. 239, Ex. 703-R, pp. 316-317.) In other words, Dye and Peck's failure to do a sanity check of their results against sales of property in the area undermined their overall analysis. BC Investors does not address this critique from the Tax Court.

The Tax Court also criticized Peck's model for forecasting that, by year 20 of operation of the quarry, Beaverdam would earn revenue of $9,323,328, incur total expenses of $1,936,193, and have free cashflow of $7,387,135. (Doc. 282, p. 27.) This translates to a free cashflow-to-sales ratio of 79%, which the court noted "is unrealistic on its face and should have caused Mr. Peck to reevaluate his model." (*Id.*) BC

Investors does not address this additional failure by Peck to do an overall reasonableness check of his model.

In addition, with respect to Dye's analysis, the court found that it "is not credible to conclude that Beaverdam, a company that lacked expertise in any part of the granite industry, would have been massively profitable with only small startup expenses but not thoroughly explain why more experienced granite market participants could/would not take advantage of similar opportunities." (Doc. 282, p. 35.) BC Investors argues that Granite City's profits from 2022 and 2023 demonstrate that a quarry can achieve these results (Br. 54-55), but demand for granite at that time may have been unusually high due to unique market conditions related to Covid-19. (Doc. 232, Tr. 1062:23-1063:7) ("demand seemed like it was hitting an all-time high" because "people were pre-buying their headstones and things of that nature").

In addition, after year 2 of Dye's model, the present value of projected profits skyrockets from $383,532 to $1,557,371 in year 5, and stays high for a decade. (Doc. 282, p. 31.) It is unreasonable to think these sky-high profits are easily attainable and sustainable. Thus, the Tax Court correctly concluded that it defies logic that "the people who

live in/around the 'Granite Capital of the World' and collectively have vast experience in the granite industry are somehow failing to monetize abandoned quarries and satisfy demand for granite."  (*Id.*, p. 30.)

This issue is underscored by the lack of a historical track record for the Easement Property.  "A historical track record provides real-world inputs that supply a plausible basis for projecting future revenue." *Excelsior Aggregates, LLC, v. Commissioner*, T.C. Memo. 2024-60, at [*43]–[*44];  *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 325 (2012), *aff'd in part, vacated in part, remanded*, 755 F.3d 236 (5th Cir. 2014) (the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings")).

### c.    The Tax Court identified numerous other problems with Dye's analysis

The Tax Count found several other problems with Dye's analysis.[8] BC Investors' responses to the Tax Court's points are not persuasive.

*First*, BC Investors claims that the Tax Court erred in faulting Dye's report for not including a startup period because Granite City

---

[8] BC Investors does not attempt to defend Peck's analysis against the Tax Court's criticism.  As such, it has waived this point.

restarted in two months.  (Br. 47.)  But the Tax Court explained that it took "SSO/Hearthstone about three years after they obtained ownership of Granite City Quarries before they entered a partnership with the Dyes to operate the quarry."  (Doc. 282, p. 31 n.33.)  Dye did not take that period into consideration, and BC Investors does not address it.

*Second*, BC Investors claims that "fact witness testimony" clarified ambiguity in Dye's report regarding how he arrived at the average price of granite for future sales.  (Br. 48.)  But testimony from other witnesses does not reverse a credibility determination based on an expert's failure to adequately explain his assumptions.

*Third,* BC Investors claims that the court ought to have accepted Dye's forecast of a 6% increase in the average price of granite per year. (Br. 49-50.)  But it omits that the Tax Court's primary problem with this projection was that "Mr. Dye did not analyze whether the continued 6% rate of increase he projected was reasonable considering his forecast that Beaverdam would significantly contribute to supply" in the Elberton market.  (Doc. 282, p. 32.)  And it claims the Tax Court ought to have made "four commonsense inferences" (Br. 49-50) without providing any record support.  In any event, "different inferences from

the underlying facts implicate matters of pure fact." *TOT*, 1 F.4th at
1371.

*Fourth*, BC Investors assigns error to the Tax Court's discussion of
Dye's projected costs. For equipment expenses, it claims that the court
should have given more weight to Dye's testimony that additional
equipment would not have been necessary. (Br. 51.) For labor
expenses, ironically, it asks this Court to rehabilitate Dye's alleged
errors in misinterpreting the P&L statements from his own quarry.
(Br. 51-52.) And for non-production expenditures, it asks that this
Court conclude that Dye's failure to account for inflation could be
"negated" by his error overstating expenses elsewhere (i.e., two wrongs
somehow make a right). The Court should decline to revise on appeal
these factual issues that bear on Dye's credibility.

## 2. The Tax Court properly applied the fair market value standard

BC Investors claims that the Tax Court wrongly applied the fair
market value standard throughout its opinion because it referenced
Beaverdam's lack of experience in the quarry industry. (Br. 27-30.) As
an initial matter, this critique has nothing to do with the Court's
market analysis using the comparable sales method. When utilizing

that method, the Tax Court plainly followed the regulation's directive to determine what a willing buyer and a willing seller would pay for the property. Treas. Reg. § 1.170A-1(c)(2). Thus, this argument is only relevant if this Court first rejects the Tax Court's comparable sales analysis (which it should not).

But, in any event, the Court did not err in noting that a DCF analysis should have accounted for the need to partner with a quarry operator. A "willing buyer" does not necessarily have mining expertise sufficient to dispense with the need for a partner to undertake the mining process. BC Investors is confusing "knowledge of the relevant facts" with "expertise necessary to extract a resource from a property." (Br. 28.) There is a difference between knowing *that* there is a certain resource on a property and *how* to successfully mine the property for the resource. Thus, BC Investors is wrong to suggest that "the hypothetical buyer here is assumed to be a knowledgeable quarry operator." (Br. 7; *see also* Br. 38.) The hypothetical buyer is a knowledgeable quarry *investor* because what is being valued is raw land with the potential for a quarry, not an active quarry business. *See Savannah Shoals*, T.C. Memo. 2024-35, at [*45] (ruling that even if the

highest-and-best use of the property at issue was as an aggregate quarry, "the presence of known aggregate deposits has a minimal effect on the price of the land in the region"). And the fact that operating the quarry would likely require specialized knowledge further illustrates the absurdity of valuing the price in such a way as to allocate all of the profit for the next 25 years to the seller while ignoring that the buyer (or a partner) would be adding significant value. *See Van Zelst*, 100 F.3d at 1263.

### 3. BC Investors' additional arguments lack merit

BC Investors' argument (Br. 36-39) that the Court was required to analyze the best alternative to a negotiated agreement of all the buyers and sellers of any comparable sale is not supported by the case law. As the Tax Court stated, "[a] requirement that a party fully analyze the bargaining positions of sellers and buyers when using the comparable sales method would, in many or most instances, be impossible to meet." (Doc. 282, p. 51.) Instead, the relevant test is: "(1) the properties themselves are similar to the subject property; (2) the sales are arm's-length transactions; and (3) the sales have occurred within a reasonable time of the valuation date." *Chandler v. Commissioner*, 142 T.C. 279,

285 (2014) (citing *Wolfsen*, 72 T.C. at 19); *see also United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988) ("Comparable sales are 'sales from a willing seller to a willing buyer of similar property in the vicinity at or about the same time as the taking.'" (quoting *320.0 Acres of Land*, 605 F.2d at 798)). The Granite City Quarries sale satisfied these conditions, as did a number of other sales that the Tax Court used to corroborate its valuation.

BC Investors' argument (Br. 39-43) that the easement "sacrificed" an "owner-operator's working interest" is a red herring. The regulations instruct the court to determine the "fair market value of the property at the time of the contribution." Treas. Reg. § 1.170A-1(c)(1). Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 1.170A-1(c)(2). As the court in *Ranch Springs* noted, "[o]n this theory, it does not matter what a knowledgeable buyer would pay for the land unencumbered by the easement." 164 T.C. at 160. But, in determining valuation, "[w]hat matters is *how we determine* the [fair market value] of the property

contributed, i.e., the value of the perpetual conservation restriction."
*Id.* at 161 (emphasis in original).  BC Investors' argument about what
was "sacrificed" or "extinguished" does nothing to help the Court
determine *how* to value the Easement Property.  *Cf. 91.90 Acres*, 586
F.2d at 87 ("[T]he landowner is not entitled to have the surface value of
the land and the value of underlying minerals aggregated to determine
market value. The value of the mineral deposit is to be considered only
to the extent to which it goes into and affects the over-all market value
of the property.").

BC Investors' reliance (Br. 42-43) on *Whitney Benefits, Inc. v.
United States*, 18 Cl. Ct. 394 (1989), *aff'd*, 926 F.2d 1169 (Fed. Cir.
1991) is misplaced.  In *Whitney Benefits*, 18 Cl. Ct. at 396, one plaintiff
owned "coal underlying 1,327 surface acres" of land in Wyoming and
another plaintiff had secured the right to mine the coal, investing
significant money in preparations to do so.  The coal was effectively
taken by defendant, and plaintiffs filed suit seeking the value of the
coal taken. *Id.* at 396–98.  The Court of Federal Claims first looked to
the comparable sales method, but found the only sale identified by
defendant was not of a comparable property because (1) it was sold out

of necessity or compulsion and (2) the property sold was dissimilar to the subject coal. *Id.* at 408. Accordingly, the court used a DCF analysis to determine the value of the coal taken, finding that plaintiffs' DCF analysis was "reliable." *Id.* However, BC Investors' DCF analyses were not reliable, the comparable sale used by the Tax Court does not suffer from the same flaws, and sales data support a much lower value for the Easement Property.

### 4. The Tax Court properly did not shift the burden of proof, and it is not relevant in any event

Finally, BC Investors' argument regarding the burden of proof (Br. 25-27) is misplaced. The Tax Court properly determined (Doc. 282, p. 26) that BC Investors' experts were not credible, as explained above, and thus, correctly declined to shift the burden. *Blodgett v. Commissioner*, 394 F.3d 1030, 1035–36 (8th Cir. 2005). In addition, the burden of proof is not relevant because "[i]n a situation in which both parties have satisfied their burden of production by offering some evidence, then the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof or preponderance." *Id.* at 1039 (citing Philip N. Jones, *The Eighth Circuit Weighs In on the Burden of Proof-Will It Change the Outcome After All?*,

98 J. Tax'n 226, 230 (2003)). And "a shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie." *Id.* Any error by the Tax Court in failing to shift the burden was harmless because "the weight of the evidence supported a decision for the Commissioner." *Id.*[9]

### D. The Tax Court's penalty determination follows from its merits ruling

The gross valuation misstatement penalty applies because the valuation of the Easement Property exceeded 200% of the property's correct value. I.R.C. § 6662(h)(2)(A)(i). BC Investors mentions "reasonable cause" as a defense (Br. 55), but reasonable cause is not available where the overstatement is "gross." *See* I.R.C. § 6664(c)(3). Thus, the Court should affirm the imposition of the penalty.

---

[9] BC Investors relies on *Griffin v. Commissioner*, 315 F.3d 1017 (8th Cir. 2003), but fails to mention that the Eighth Circuit later determined that *Griffin* conflicted with another circuit precedent, *Polack v. Commissioner,* 366 F.3d 608, 613 (8th Cir. 2004). *See Blodgett*, 394 F.3d at 1039. The court followed *Polack* rather than *Griffin. Id.*

## CONCLUSION

For the foregoing reasons, the decision of the Tax Court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
 *Assistant Attorney General*
JOSHUA WU
 *Deputy Assistant Attorney General*

/s/ *Robert J. Wille*

JENNIFER M. RUBIN                    (202) 307-0524
ROBERT J. WILLE                       (202) 514-5573
 *Attorneys, Tax Litigation Branch*
 *Civil Division, U.S. Department of Justice*
 *Post Office Box 502, Washington, D.C. 20044*
 *Appellate.TaxCivil@usdoj.gov*
 *Robert.J.Wille@usdoj.gov*

FEBRUARY 26, 2026

# CERTIFICATE OF COMPLIANCE

## With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

Check the appropriate box in section 1, and check the box in section 2.

### 1. Type-Volume

[X]    This document complies with the word limit of FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 12,292 words.

**or**

[ ]    This brief complies with the line limit of FRAP ____ because, excluding the parts of the brief exempted by FRAP 32(f) and ____, this brief uses a monospaced typeface and contains ____ lines of text.

### 2. Typeface and Type-Style

[X]    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).

(s) _Robert J. Wille_

Attorney for _Commissioner of Internal Revenue_

Dated: _February 26, 2026_